# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

In the Matter of the Search of:

an Apple iPhone Model A1688, serial number
DNPRMWZHGRY5, IMEI 355767079252933, currently
located at the U.S. Department of Justice's Bureau of
Alcohol, Tobacco, Firearms, and Explosives's Milwaukee
Field Office.

)
)
)
)
)
)

Case No. 19-858M(NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A (incorporated by reference).

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim P. 41(c) is:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 844(i) and 844(m).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Rick Hankins, ATF
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: May 9, 2019

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing a supplemental examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.    On February 1, 2019, this Court issued a warrant to search the person of DONALD NEUMANN (DOB: XX/XX/1966) and seize the cellular device assigned call number (414) 899-6082 ("target cellphone").

3.    On February 4, 2019, I seized the target cellphone from DONALD NEUMANN.

4.    On February 11, 2019, this Court issued a warrant authorizing a forensic examination of the target cellphone for the purpose of identifying electronically stored information relevant to this investigation. I incorporate that warrant and application by reference.

5.    The Government executed that search warrant on or about February 13, 2019 using Cellebrite's Physical Analyzer software. That search provided information material to this investigation, as detailed below.

6.    In an abundance of caution, the Government seeks another warrant to examine the same electronic device—the target cellphone—and extract electronically stored information using additional forensic tools, including GrayKey's software.

7.    In the initial warrant application, the Government only sought records or information relating to an arson affecting interstate commerce, in violation of Title 18, United

States Code, Section 844(i), and conspiracy to commit arson, in violation of Title 18, United States Code, Section 844(m), which occurred on or about January 2, 2019.

8. In this supplemental application, however, the Government also seeks records or information relating to the destruction, alteration, or falsification of records in federal investigations, in violation of Title 18, United States Code, Section 1519; false statement, in violation of Title 18, United States Code, Section 922(a)(6) and 924(a)(2); and, furnishing a firearm to a prohibited person, in violation of Title 18, United States Code, Sections 922(d)(9) and 924(a)(2).

## II. AGENT BACKGROUND

9. I am a Special Agent of the U.S. Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

10. I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy. That training included various legal courses related to constitutional law as well as search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

11. In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training

2

program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 255 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,200 class hours of fire-related training. Furthermore, I have been an instructor regarding fire-related topics on 38 occasions for the following agencies and institutions: The National Fire Academy (FEMA), International Association of Arson Investigators Chapter 25, Waukesha County Technical College, and Blackhawk Technical College. I have also participated in over 185 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from approximately August 2015 to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

12. This affidavit is based upon my personal knowledge as well as information provided to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience.

3

13.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

14.     As a part of my duties with the ATF, I investigate criminal violations relating to arson and arson-related offenses, including violations of Title 18, United States Code, Section 844. During the course of my investigations, I have regularly used data forensically extracted from cellular devices to obtain evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

15.     There is probable cause to believe that evidence of the following crimes is contained in the electronically stored information on the target cellphone:

> a. an arson affecting interstate commerce, in violation of Title 18, United States Code, Section 844(i), and conspiracy to commit arson, in violation of Title 18, United States Code, Section 844(m), occurring in Milwaukee, Wisconsin on or about January 2, 2019;
>
> b. the destruction, alteration, or falsification of records in federal investigations, in violation of Title 18, United States Code, Section 1519 since December 15, 2018;
>
> c. false statement, in violation of Title 18, United States Code, Sections 922(a)(6) and 924(a)(2), on or about December 2, 2016; and
>
> d. furnishing a firearm to a prohibited person, in violation of Title 18, United States Code, Sections 922(d)(9) and 924(a)(2), between November 5, 2015 and January 11, 2019 relating to firearms recovered from the custody, control, and possession of Matthew Neumann.

4

16.     Because I submit this affidavit for the limited purpose of securing authorization to examine property—an electronic device—and the extraction from that property of electronically stored information, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish probable cause.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

17.     The property to be searched is an Apple iPhone Model A1688, serial number DNPRMWZHGRY5, IMEI 355767079252933—the target cellphone. The target cellphone is currently located at the ATF's Milwaukee Field Office.

18.     The applied-for warrant would authorize the forensic examination of the target cellphone for the purpose of identifying electronically stored data particularly described in Attachment B.

## II.     PROBABLE CAUSE

19.     In conjunction with other federal, state, and local law enforcement officers, I am conducting an investigation into an arson affecting interstate commerce and a conspiracy to commit arson that occurred on January 2, 2019 in the vicinity 716 West Rogers Street in Milwaukee, Wisconsin, in violation of Title 18, United States Code, Sections 844(i) and 844(m).

20.     On January 2, 2019 at approximately 9:55 p.m., the Milwaukee Fire Department and the Milwaukee Police Department responded to a vehicle fire in the vicinity of 716 West Rogers Street in Milwaukee, Wisconsin. The vehicle was identified as a 2001 Ford F-250 pickup

5

truck bearing Wisconsin license plate MA-9985 and Vehicle Identification Number 1FTNW21L21EC43063. Police officers were informed that the fire was suspicious.

21. A registration check with the Wisconsin Department of Motor Vehicles revealed that the Ford F-250 pickup truck bearing Wisconsin license plate MA-9985 is registered to Matthew Neumann (DOB: XX/XX/1975), who lives at 9426 South 29th Street in Franklin, Wisconsin.

22. At about 11:00 p.m. on January 2, 2019, police officers of the Franklin Police Department contacted Matthew Neumann at his residence. One officer noticed a strong odor of a chemical accelerant, once let inside by Matthew Neumann, and observed clothing lying nearby. Matthew Neumann told the police officers that he owns eight trucks, because he owns a plowing business and that he lets one of his employees drive the Ford F-250 home.

23. Police officers later interviewed Matthew Neumann's family. Tammy Neumann, Matthew Neumann's wife, stated that at approximately 5:00 a.m. on January 2, 2019 she was awoken by Matthew Neumann at their residence at 9426 South 29th Street in Franklin, Wisconsin. She observed that Matthew Neumann was intoxicated and began undressing, and she also noticed that Matthew Neumann had a black handgun and heard him rack the slide.

24. When she left the house later that morning, Tammy Neumann observed Matthew Neumann's 2001 Ford F-250 pickup truck bearing Wisconsin license plate MA-9985 parked on the driveway and observed a white male, approximately 35 to 40 years old, slumped down in the passenger seat. Tammy Neumann looked through the window and observed no signs of life. She thought that the male had blood around his nose and mouth and that the passenger window may have been spidered, as if struck by a human head.

6

25.     According to Tammy Neumann, Matthew Neumann did not return to the residence until about 10:00 p.m. that night. When he did, Tammy Neumann smelled a strong odor of diesel fuel on Matthew Neumann's clothes, such that she told Matthew Neumann to put the clothes outside.

26.     Matthew Neumann's daughter overheard a conversation between Tammy Neumann and Matthew Neumann, where Matthew Neumann said that he shot "Rich" or "Dick" "over a pack of squares." Tammy Neumann and her daughter left the residence and later returned. At that point, the truck was gone along with Matthew Neumann.

27.     On January 8 and 11, 2019, I conducted a fire scene examination of the Ford F-250 along with the Milwaukee Police Department and Wisconsin Department of Justice's Division of Criminal Investigation pursuant to a state search warrant. One officer discovered a bullet hole and strike on the B-pillar of the passenger side of the pickup truck, a lead bullet fragment at the base of the B-pillar in the midst of fire debris, and other lead bullet fragments on the B-pillar. Using a trajectory rod, another officer determined that the bullet traveled from the driver seat area to the B-pillar of the passenger seat. Officers also located a bullet and casings inside of a black melted mass on the driver's side floorboard. I located blood along the weather stripping on the passenger floorboard, removed the passenger seat, and observed additional blood on the flooring and carpeting. I also recovered fire debris from the backseat area that emitted an odor consistent with that of a petroleum distillate.

28.     The ATF Forensic Laboratory later analyzed fire debris samples recovered from the truck bed and the backseat area of the Ford F-250. The laboratory results showed the presence of gasoline in the truck bed and back seat area of the Ford F-250.

7

29. I also obtained surveillance video that captured Matthew Neumann drive the Ford F-250 into the Citgo gas station located at 610 West Becher Street at 9:44 p.m. on January 2, 2019, followed by an early 2000s maroon Chevrolet Impala. Matthew Neumann purchased cigarettes and a lighter at the Citgo gas station. The Ford F-250 and Chevrolet Impala subsequently disappeared east out of the video frame.

30. At approximately 9:47 p.m., a second surveillance video captured the Ford F-250 turn westbound on Rogers Street from South 6th Street, followed by the Chevrolet Impala. The Ford F-250 parked westbound on Rogers Street immediately east of 1978 South 8th Street. The driver's door of the Ford F-250 subsequently opened, Matthew Neumann exited, and a clear illumination appears inside of the Ford F-250 at 9:48 p.m. as the Chevrolet Impala passed. The Chevrolet Impala traveled westbound on Rogers Street and turned southbound on 8th Street, stopping south of the intersection. There was a sudden and intense sustained flash of light inside the Ford F-250 as Matthew Neumann walked and then ran to the parked Chevrolet Impala and entered the passenger side of the Impala. The Impala then drove away. The Impala was captured on surveillance video traveling south on 8th Street away from the burning truck and then west on Becher Street.

31. After examining the Ford F-250, reviewing the surveillance videos, and obtaining laboratory results, I determined that the fire was the result of the human introduction of a heat source to available combustible material inside the passenger compartment of the Ford F-250, including the presence of an ignitable liquid. Based on my knowledge, training, and experience, I conclude this fire was incendiary.

8

32.    Officers also recovered the clothing that Matthew Neumann had been wearing when he returned home on January 2, 2019. That clothing contained the odor of diesel fuel, blood in several areas, and a burn area. That clothing also matched the clothing Matthew Neumann was seen wearing on the Citgo gas station surveillance video minutes prior to the Ford F-250 fire.

33.    During an interview with officers on January 10, 2019, Matthew Neumann admitted to starting the fire of the Ford F-250, claiming that he did so accidentally. He claimed that, after the vehicle fire, another vehicle in the area picked him up and that he paid the driver $30 to $40 to take him to a tavern close to his home. Matthew Neumann claimed that the driver of the vehicle was a white male and that the vehicle was burgundy or maroon in color and from the late 1990s or early 2000s—this description is consistent with that of Donald Neumann and Donald Neumann's 2003 Chevrolet Impala.

34.    Officers later executed a search warrant on hunting land leased by Matthew Neumann in the Mukwonago area and located a black-and-white Spot Free Cleaning trailer. Next to the trailer was a burn pit containing the heavily charred remains of two individuals, along with other items such as charcoal and charcoal bags.

35.    Officers of the Franklin Police Department recovered surveillance video from the Home Depot in Mukwonago, approximately five miles from Matthew Neumann's hunting property, which depicts Matthew Neumann alone on January 3, 2019 at 10:58 a.m. purchasing four bags of charcoal, lighter fluid, and eight pieces of lumber.

36.    According to publicly available court records, the State of Wisconsin charged Matthew Neumann with First-Degree Reckless Homicide, in violation of Wisconsin Statute

9

940.02, and Mutilating or Hiding a Corpse, in violation of Wisconsin Statute 940.11(2), in Milwaukee County Case No. 2019CF000204.

37. Those records also show that Tammy Lee Neumann is the petitioner in a divorce proceeding against Matthew John Neumann, which was filed on January 22, 2019 in Milwaukee County Case No. 2019FA000372.

38. I have reviewed the cell site and telephone toll records associated with (414) 350-7417, the call number assigned to Matthew Neumann's cellular device. A CLEAR search indicates that DONALD NEUMANN is associated with the call number (414) 899-6082. Detective Jason Ireland of the Franklin Police Department also identified (414) 899-6082, the call number assigned to the target cellphone, as the cell phone number for DONALD NEUMANN. Detective Ireland has communicated with DONALD NEUMANN multiple times in the recent weeks on that call number.

39. The cell site and telephone toll records show that Matthew Neumann's cellular device and the target cellphone exchanged approximately 17 phone calls between 8:02 p.m. and 9:38 p.m. on January 2, 2019. Notably, Matthew Neumann had no other contact with any other number during that time period. There is probable cause to believe that the target cellphone contains a record of the phone calls exchanged with Matthew Neumann on January 2, 2019, along with evidence of the use and ownership of the target cellphone and the use and ownership of Matthew Neumann's cellular device.

40. The cell site and telephone toll records for Donald Neumann's phone number 414-899-6082 indicate that Donald Neumann's cellphone was in the vicinity of 716 West Rogers Street at about the time of the arson on January 2, 2019, because his cellphone used multiple cell towers

10

and sectors in and around that location. These pings on the cell site maps are also consistent with Matthew Neumann's cell site and telephone toll records, which indicate multiple calls on or about those times.

41. I know that Donald Neumann has a registered address in the Eastern District of Wisconsin. I have reviewed records from the Wisconsin Department of Transportation, which show that he registered a red 2003 Chevrolet Impala on November 30, 2018 and listed a mailing address of W141N513 Ridgeway Lane in Menomonee Falls, Wisconsin 53051. A CLEAR search also indicates that Donald Neumann registered a red 2003 Chevrolet Impala bearing Wisconsin license plate AEE-6205 on or about November 30, 2018 with a registered mailing address of W141N513 Ridgeway Lane, Menomonee Falls, Wisconsin 53051.

42. On or about January 21, 2019, the Milwaukee Police Department executed a search warrant on Donald Neumann's maroon 2003 Chevrolet Impala. The officers found that the interior of the vehicle had recently been deep cleaned. I compared the photos of Donald Neumann's seized Chevrolet Impala to the surveillance video on the night of the truck fire. There were no dissimilarities in the appearances of the two vehicles. In fact, the color, wheel rims, and trunk spoiler appeared consistent with one another.

43. Samples of the front passenger seat cover of Donald Neumann's Chevrolet Impala were tested and found to contain gasoline.

44. As a result of witness interviews, business records, and search warrant executions, I also know that Matthew Neumann's Ford F-250 was a business vehicle in the name of Spot Free Cleaning and that the Ford F-250 was regularly used in or affecting interstate commerce.

11

45. Matthew Neumann's address—9426 South 29th Street in Franklin, Wisconsin—and cell phone number 414-350-7417 are also the listed contact information for Spot Free Cleaning Solutions on the publicly available listing on Angie's List (https://www.angieslist.com/companylist/us/wi/franklin/spot-free-cleaning-solutions-reviews-6459566.htm) (last viewed on January 31, 2019). The description of Spot Free Cleaning on Angie's List is as follows:

Commercial Cleaning Every masterpiece begins with a crystal clear canvas and the same goes for your business. Whatever your trade, the appearance and cleanliness of your facility are of the utmost importance to customers, employees and the general public. Get your competitive edge at an affordable price with Spot Free Cleaning! When it comes to professionalism and success, it's all about first impressions. With state-of-the-art equipment and over 17 years of commercial cleaning experience, Spot Free guarantees that a first impression will be the last thing on your mind. Sign up for our daily, weekly or monthly cleaning programs to keep your cleaning woes out of sight-out of mind. We offer 24 hour service, 365 days a year! We offer a full range of services including floor care, carpet cleaning, window cleaning, pressure washing and snow plowing. The Spot Free Cleaning difference is simple-we go the extra mile. From the shine of your showroom to a pristine parking lot, you can count on us to get the job done.

46. Matthew Neumann's cell phone number 414-350-7417 is also the listed contact information for Spot Free Cleaning on the publicly available listing on Yelp (https://www.yelp.com/biz/spot-free-cleaning-franklin-2) (last viewed on January 31, 2019).

47. During my fire scene examination, I observed a plow mount on the front end of the Ford F-250, along with a power and control tether for a plow that ran into the passenger compartment of the truck.

48. On January 8, 2019, the Franklin Police Department executed a search warrant at the business address for Spot Free Cleaning. The officers found two work trucks, both with plows

12

attached to their front ends. The photos from that search warrant also show a third plow unattached to a vehicle on the ground. There were no other vehicles at the business location equipped with a plow mount. I believe that the unattached plow found during this search warrant execution had likely been used with the Ford F-250 pickup truck bearing Wisconsin license plate MA-9985.

49.    During that search, police officers also recovered business records from Spot Free Cleaning. Those records indicate that Spot Free Cleaning had performed salting and plowing services from at least November 15, 2018 through January 2, 2019. Those records also include contract(s) and addenda between Spot Free Cleaning and Reliable Property Services for a winter snow removal service for the 2018-2019 season. Those documents appear to be signed by Matthew Neumann.

50.    On January 29, 2019, police officers from the Franklin Police Department spoke with Tammy Neumann and Matthew Neumann, Jr., who indicated that the Ford F-250 pickup truck was used for business purposes by Spot Free Cleaning, that all employees were allowed to drive and use the Ford F-250 pickup truck for business purposes, and that the Ford F-250 pickup truck was used for snow plowing. Matthew Neumann, Jr. indicated that the Ford F-250 had been used during the winter of 2017-2018, but had not been used during the winter of 2018-2019 because there had not been enough snow.

51.    A transaction record from Summit Credit Union shows a business loan in the name of Spot Free Cleaning was issued for a 2001 Ford on or about December 31, 2016, that regular payments have been made since, and that, as of July 20, 2018, a nearly $4,000 balance remained.

52.    Insurance documents provided by 1st Auto & Casualty Insurance Company indicates that Matthew Neumann's 2001 Ford F-250 bearing the same Vehicle Identification

13

Number was insured as a business vehicle for Spot Free Cleaning with a policy period of February 18, 2018 to February 18, 2019.

53. During the search of Spot Free Cleaning on January 8, 2019, police officers also recovered approximately 69 firearms from inside of a safe. Many of those firearms still had evidence tags and zip ties from Matthew Neumann's arrest on November 5, 2015 and related charges in Milwaukee County Case No. 2015CF004844.

54. On January 11, 2019, police officers confiscated another three firearms from a blue trailer on Matthew Neumann's hunting land in Mukwonago. Each of those had previously been confiscated by the Franklin Police Department in 2015.

55. In Milwaukee County Case No. 2015CF004844, Matthew Neumann was found guilty of Endangering Safety by Use of a Dangerous Weapon While Intoxicated (Domestic Abuse), in violation of Wisconsin Statutes 941.20(1)(b) and 968.075(1)(a), and Disorderly Conduct (Domestic Abuse) (Use of a Dangerous Weapon), in violation of Wisconsin Statutes 947.01(1), 968.075(1)(a), and 939.63(1)(a), on January 28, 2016. He was sentenced that day and advised that he was prohibited from possessing a firearm due to his conviction for a crime of domestic violence. (According to publicly available court records, Matthew Neumann is also prohibited from possessing a firearm because he was convicted on or about November 7, 2016 of Fleeing and Eluding, a felony, in violation of Wisconsin Statute 346.04(3), in Milwaukee County Case No. 2016CF003252.)

56. Matthew Neumann, by his attorney, petitioned the court for the return of his firearms. He reached a stipulation with the City of Franklin allowing the release of those firearms to a federal firearms licensee for sale on consignment. In that stipulation, Matthew Neumann, by

14

Case 2:19-mj-00858-NJ   Filed 06/03/19   Page 15 of 28   Document 1

his attorney, acknowledged that he cannot possess a firearm under federal law and agreed to sell the itemized firearms on consignment. The stipulation and order were issued by the Honorable Janet C. Protasiewicz of the Milwaukee County Circuit Court on November 22, 2016.

57. Matthew Neumann selected Casey W. Steiner, a federal firearms licensee in Franklin, Wisconsin, to sell his firearms on consignment. On or about December 1, 2016, Mr. Steiner took possession of the 64 firearms confiscated from Matthew Neumann.

58. On or about March 18, 2019, I interviewed Casey W. Steiner of Alpha Gunsmith. He provided business records showing that Donald Neumann purchased Matthew Neumann's firearms from Alpha Gunsmith on or about December 2, 2016—the day after their release to Mr. Steiner. Those business records included a Firearms Transaction Record (U.S. Department of Justice and Bureau of Alcohol, Tobacco, Firearms, and Explosives Form 4473) completed by Donald Neumann indicating that he was the actual buyer of the firearms.

59. A law enforcement officer compared the firearms recovered from Matthew Neumann in 2015 with those recovered from Matthew Neumann in 2019 by description and serial number. That comparison revealed that 63 of the 64 firearms confiscated in 2015 and resold were recovered from Matthew Neumann's business and hunting land.

60. As described below, the initial forensic examination of Donald Neumann's phone indicated that he has actively used the target cellphone since at least 2014. There is probable cause to believe that evidence relating to this firearms purchase and subsequent transfer of firearms from Donald Neumann to Matthew Neumann will be found on the target cellphone.

61. On February 1, 2019, this Court issued a search warrant authorizing the search of Donald Neumann's person for the seizure of the cellular device assigned phone number 414-899-

15

6082. On February 4, 2019, I observed Donald Neumann using the cellular device assigned phone number 414-899-6082 in front of his residence, located at W141N513 Ridgeway Lane in Menomonee Falls, Wisconsin 53051. I seized his cellphone—an Apple iPhone.

62. On February 11, 2019, this Court issued a warrant authorizing the forensic examination of Donald Neumann's Apple iPhone. Pursuant to that search warrant, Special Agent Undre Ludington of the ATF extracted information from the cellphone using Cellebrite's Physical Analyzer forensic extraction software.

63. The forensic extraction report indicates that the Apple ID associated with that phone is rock2don@yahoo.com, that an iCloud account is present, and that the MSISDN associated with that phone is 4148996082. The report also indicates that the cellular device was used to send a text message on February 1, 2019 referring to Donald Neumann's 2003 Chevrolet Impala, stating in substance: "You know my brother has not sat in that car for 10 days Since I picked him up our car has been anywhere and everywhere. Sent this to lawyer too." Officers of the Milwaukee Police Department and Franklin Police Department seized Donald Neumann's 2003 Chevrolet Impala on January 13, 2019—approximately 10 days after the arson on January 2, 2019.

64. A comparison of the forensic extraction report for Donald Neumann's Apple iPhone and the cell site and toll records for Donald Neumann's call number 414-899-6082, the call number assigned to that same cellphone, indicates that relevant electronic evidence immediately prior to the arson was deleted from the cellphone.

65. The forensic extraction report indicates that 76 locations, 24 notes, 87 searched items, and 121 web history items were deleted. The phone's log entries indicate data usage on

16

December 29, 2019, January 2, 2019, January 4, 2019, January 5, 2019, January 7, 2019, January 8, 2019, and January 10, 2019. However, the Chrome search history only dates back to January 3, 2019, the day after the arson. No Chrome search history prior to that date is contained in the forensic extraction report, even though the report indicates numerous Chrome searches after that date until the seizure of the cell phone. Donald Neumann's cell phone also contains records of Safari searches, but only prior to November 19, 2017. There is no search history from November 19, 2017 to January 3, 2019—more than a one-year gap. This suggests that the Chrome search history prior to the arson was deleted.

66. The same is true of call and text message history. The call history contains records of incoming and outgoing phone calls after January 29, 2019. In fact, the forensic extraction report indicates that Donald Neumann made or received 189 calls between January 29, 2019 and February 4, 2019—the date I seized the phone. There are no records of phone calls made using the call number 414-899-6082 prior to January 29, 2019 contained in the forensic extraction report. There are, however, sporadic calls made or received using Facebook Messenger prior to that date.

67. Likewise, the MMS message history only includes messages from January 15, 2019 to January 30, 2019; there are no MMS messages prior to this date. The SMS message history includes messages from January 15, 2019 to February 4, 2019; there are no SMS messages prior to this date.

68. The username rock2don@yahoo.com was first used as a User Account on the cellphone on November 28, 2014, according to the forensic extraction report. The forensic extraction report also indicates that a contact numbers for a "Spoty," a "Tammy Cell", a "Spot," a "Saukville Sue," a "Sherwin Brookfield," a "Sherwin 124th St.," a "Sherwin West Alis," a

17

"Sherwin Grafton," a "Sherwin Pewaukee," and a "Matt & Tammy" contain a timestamp of April 11, 2013. I know that Donald Neumann is a painter by profession. The contact photo for "Matt & Tammy" contains a photograph of Matthew Neumann, and that contact was created on April 11, 2013.

69. In an abundance of caution, the Government seeks a supplemental warrant to examine the target cellphone and extract electronically stored information using additional forensic tools, including GrayKey's forensic extraction software.

70. Based on information provided by other law enforcement officers, I know that forensically examining an Apple cellular device using Cellebrite's UFED Touch 2, Cellebrite's UFED4PC, or Cellebrite's Physical Analyzer software extracts only limited data from the target cellphone, similar to that of an Apple iTunes backup. An iTunes backup is designed to backup an Apple device or transfer data from an old device to a new device. Data unrelated to those purposes is not captured by that limited data extraction.

71. GrayKey's software, by contrast, provides a full file system extraction—extracting data not included on an iTunes backup, such as health kit data, extensive GPS points, deleted images, email content, deleted messages, and other records and information relevant to this investigation. (GrayKey is one tool to obtain a full file system extraction from Apple devices.) Once the data is copied from the target cellphone using GrayKey, that data can then be decoded using other forensic software including but not limited to Cellebrite's Physical Analyzer or Magnet's AXIOM.

72. As noted above, there is evidence that records and information (including messages and search histories) were deleted from the target cellphone. I submit that there is probable cause

18

to believe that a full file system extraction will lead to material evidence of the crimes under investigation.

73. The target cellphone is currently in the lawful possession of the ATF.

74. The target cellphone is currently in storage at the ATF's Milwaukee Field Office. In my training and experience, I know that the target cellphone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the target cellphone first came into the possession of the ATF. I also know that electronic devices can store information for long periods of time.

## TECHNICAL TERMS

75. Based on my training and experience, I use the following technical terms to convey the following meanings:

> a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

19

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

20

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

76. Based on my training, experience, and research, I know that the target cellphone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

77. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

78. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

21

the target cellphone was used, the purpose of its use, who used it, and when. There is probable

cause to believe that this forensic electronic evidence might be on the target cellphone because:

> a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).
>
> b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.
>
> c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.
>
> d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.
>
> e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.
>
> f. I know that when an individual uses an electronic device to communicate with a co-conspirator, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

22

79.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

80.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## III.    CONCLUSION

81.     For the foregoing reasons, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the target cellphone described in Attachment A to seek the items described in Attachment B.

23

## ATTACHMENT A

1. The property to be searched is an Apple iPhone Model A1688, serial number DNPRMWZHGRY5, IMEI 355767079252933, hereinafter the "target cellphone." The target cellphone is currently located at the ATF's Milwaukee Field Office.

2. This warrant authorizes the forensic examination of the target cellphone for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.  All records and information on the target cellphone described in Attachment A
that relate to violations of arson affecting interstate commerce, in violation of Title 18, United
States Code, Section 844(i), and conspiracy to commit arson, in violation of Title 18, United
States Code, Section 844(m), occurring on or about on January 2, 2019; the destruction,
alteration, or falsification of records in federal investigations, in violation of Title 18, United
States Code, Section 1519 since December 15, 2018; false statement, in violation of Title 18,
United States Code, Sections 922(a)(6) and 924(a)(2), on or about December 2, 2016; and,
furnishing a firearm to a prohibited person, in violation of Title 18, United States Code, Sections
922(d)(9) and 924(a)(2), between November 5, 2015 and January 11, 2019, including records
and information before or after those dates and including the following:

   a.  preparatory steps taken in furtherance of these crimes;

   b.  any information related to communications between Donald Neumann and
       Matthew Neumann;

   c.  any information about the relationship between Donald Neumann and Matthew
       Neumann;

   d.  any information related to the use, possession, custody, or control of the phone
       number (414) 350-7417;

   e.  any information related to the use, possession, custody, or control of the phone
       number (414) 899-6082;

   f.  any information about phone numbers associated with Donald Neumann;

   g.  any information about phone numbers associated with Matthew Neumann;

   h.  any information about Spot Free Cleaning, a.k.a. Spot Free Cleaning Solutions,
       a.k.a. Spot Free Plowing, a business located in Franklin, Wisconsin, its
       employees, and its customers;

   i.  any information about the knowledge, use, possession, custody, or control of
       accelerants, ignitable liquids, or heat sources;

j. any information about the appearance or clothing of Donald Neumann or Matthew Neumann from December 15, 2018 to the present;

k. any information relating to land leased by Matthew Neumann located in the vicinity of Mukwonago, Wisconsin;

l. any information relating to a Home Depot in the vicinity of Mukwonago, Wisconsin;

m. any information relating to a Citgo gas station located at 610 West Becher Street in Milwaukee, Wisconsin;

n. any information about Matthew Neumann's purchase, possession, use, transfer, disposition, or discharge of a firearm or firearms from November 5, 2015 to the present;

o. any information about Donald Neumann's purchase, possession, use, transfer, disposition, or discharge of a firearm or firearms from November 5, 2015 to the present;

p. any information related to motive, intent, or knowledge of the violations described above;

q. any information related to Donald Neumann's schedule, travel, or location from December 15, 2018 to the present;

r. any information related to Matthew Neumann's schedule, travel, or location from December 15, 2018 to the present;

s. any information related to the concealment or destruction of evidence of the violations described above;

t. any information about the use, ownership, custody, control, and cleaning of a red Chevrolet Impala;

u. any information related to the use, ownership, custody, control, damage, or destruction of a Ford F-250 (WI: MA-9985);

v. any information relating to State v. Matthew J. Neumann, Milwaukee County Case No. 2015CF004844;

w. any information relating to Casey W. Steiner or Alpha Gunsmith;

x. any information about the transfer or disposition of firearms between Donald Neumann and Matthew Neumann;

y. any information related to firearms recovered from the possession, custody, or control of Matthew Neumann or Spot Free Cleaning in January 2019.

2

2.    Evidence of user attribution showing who used or owned the target cellphone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

3